UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LISA SAXTON, | ) | |
| | ) | |
| Plaintiff, | ) | 19 C 1544 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| CHAD WOLF, Acting Secretary, U.S. Department of Homeland Security, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Lisa Saxton brings this suit against Chad Wolf, in his official capacity as Acting

Secretary of the Department of Homeland Security ("DHS"), under Title VII of the Civil Rights

Act of 1964, 42 U.S.C. § 2000e *et seq.*, alleging that DHS subjected her to a hostile work

environment, discriminated against her on the basis of her race and sex, and terminated her in

retaliation for complaining about race and sex harassment. Doc. 1. Early in the litigation, the

court denied DHS's motion to transfer the suit to the District Court for the District of Columbia.

Doc. 25. With discovery closed, DHS moves for summary judgment. Doc. 65. The motion is

granted in part and denied in part.

**Background**

The court recites the facts as favorably to Saxton as the record and Local Rule 56.1

permit. *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). At

this juncture, the court must assume the truth of those facts, but does not vouch for them. *See*

*Gates v. Bd. of Educ. v. Chi.*, 916 F.3d 631, 633 (7th Cir. 2019).

Saxton, an African-American woman, started working for the Federal Emergency

Management Agency ("FEMA") in 2011 as a community relations specialist. Doc. 74 at p. 3,

¶ 7; *id*. at p. 30, ¶ 1. A component of DHS, FEMA delivers assistance to survivors of natural disasters and other catastrophic events. *Id*. at p. 1, ¶ 1. At some point, the name of Saxton's position was changed from community relations specialist to reservist, and she began working with FEMA's Disaster Survivor Assistance ("DSA") cadre. *Id*. at pp. 2-3, ¶¶ 4, 7. DSA reservists work on an on-call, intermittent basis and are deployed to work on specific emergencies. *Id*. at p. 2, ¶ 3. Saxton held this position until she was terminated in 2016. *Id*. at pp. 3, 29, ¶¶ 7, 76.

The events giving rise to this suit occurred while Saxton was deployed to disaster zones in South Carolina, Louisiana, and Texas. For each deployment, Saxton was assigned a first-level deployment supervisor ("crew leader") and a second-level deployment supervisor ("task force leader") to whom she reported in the field. *Id*. at pp. 2-4, 7-8, ¶¶ 6, 9, 20, 24; *id*. at pp. 31, 35, ¶¶ 4, 18. At all times, DSA cadre management at FEMA's headquarters in Washington, D.C. were Saxton's "supervisors of record." *Id*. at p. 2, ¶ 5.

### A.     South Carolina Deployment

On October 10, 2015, Saxton was deployed to a disaster area in South Carolina. *Id*. at p. 3, ¶ 8; *id*. at p. 30, ¶ 3. Saxton's crew leader was Dennis Smith, and her task force leader was Kevin McKinnon. *Id*. at pp. 3-4, ¶ 9; *id*. at p. 31, ¶ 4. As crew leader, Smith directed Saxton's daily activities, including where and with whom she would work that day, and was responsible for evaluating her performance. *Id*. at p. 31, ¶ 4. Smith also had the authority to recommend discipline and to send Saxton home early from deployment. *Id*. at p. 31, ¶ 4. (DHS disputes this fact, contending that the FEMA Reservist Program Directive states that deployment supervisors have authority only to "[r]efer recommendations for adverse personnel actions against Reservists, to include discipline or termination … to the RPM [Reservist Program Manager][.]" Doc. 80 at ¶ 4 (quoting Doc. 74-3 at 27). Because Saxton's assertion that Smith had the

authority to send her home early from a deployment is supported by the evidence she cites,

Doc. 74-2 at p. 2, ¶¶ 10-12 (averring that crew leaders "can kick you off the deployment," which

"effectively end[s] your employment because you have no idea when the next deployment will

be," and that, "[i]n fact, Smith told [Saxton] he'd send [her] home if [she] did not sleep with

him"), the court credits her assertion at this juncture. *See Johnson*, 892 F.3d at 893 ("On

summary judgment we must view the facts and make all reasonable inferences that favor them in

the light most favorable to the party opposing summary judgment.").)

At the beginning of Saxton's deployment, Smith tried to get her to volunteer as a "reports

writer" so the pair would be partnered together, and he told Saxton that he would introduce her to

the "right people" so she could get more deployments. Doc. 74 at p. 31, ¶ 5 (quoting Doc. 66-1

at 151-152). Smith also took one or more photos of Saxton in front of the operation's joint field

office ("JFO") without her consent. *Id*. at p. 4, ¶ 10; *id*. at p. 31, ¶ 5. When Smith learned that

Saxton was not staying at his hotel, he asked her to move to his hotel. *Id*. at p. 31, ¶ 6. (DHS

disputes this fact, Doc. 80 at ¶ 6, but it is supported by the evidence cited by Saxton, Doc. 66-1 at

152.) Smith raised Saxton's hotel choice with her almost daily during the first week of her

deployment, ultimately with a "threatening" tone. Doc. 74 at p. 31, ¶ 6; Doc. 66-1 at 74 (143:15-

20), 152.

One night after the pair had dinner, Smith invited Saxton to his room. Doc. 74 at p. 4,

¶ 12; *id*. at pp. 31-32, ¶ 7. Smith suggested that it was in Saxton's best interest to accept the

invitation, but she declined. *Id*. at pp. 31-32, ¶ 7. (DHS disputes that Smith invited Saxton to his

room, Doc. 80 at ¶ 7, but this fact is supported by the evidence cited by Saxton, Doc. 66-1 at 72-

73 (135:22-136:21; 140:8-13), 152.) On another occasion, in a hotel lobby with other reservists

present, Saxton told Smith that he was "stress[ing]" her out and that her shoulders were "knotted

up." Doc. 74 at pp. 4-5, ¶ 13; *id*. at p. 32, ¶ 8 (quoting Doc. 66-1 at 152); Doc. 66-1 at 71-72
(133:24-134:22). In response, Smith squeezed her shoulder and said, "you know what to do
about that," which she understood to insinuate that sex would relieve her discomfort. Doc. 74 at
pp. 4-5, ¶ 13 (quoting Doc. 66-1 at 72 (134:1-3)). (DHS disputes that Smith touched Saxton,
Doc. 80 at ¶ 8, but this fact is supported by the evidence cited by Saxton, Doc. 66-1 at 71-72
(133:24-134:3), 152.) Matters escalated when, on October 21, Smith told Saxton that he would
send her home if she did not sleep with him. Doc. 74 at p. 32, ¶ 9. (DHS disputes this fact,
noting that Saxton, at her deposition, "did not recall [the] date, location, or specific wording" of
Smith's statement. Doc. 80 at ¶ 9 (citing Doc. 66-1 at 75 (146:22-147:20)). But the fact is
supported by the evidence cited by Saxton—her declaration, Doc. 74-2 at p. 2, ¶ 11, and the
affidavit she submitted in conjunction with her administrative complaint to DHS, Doc. 66-1 at
153.)

After Saxton refused Smith's advances, Smith several times changed her work partners in
an effort to make her deployment more difficult, Doc. 74 at p. 32, ¶ 10 (citing Doc. 66-1 at 153);
denied her a day off, *ibid*. (citing Doc. 66-1 at 156); and repeatedly sent her to work at unsafe
locations, *id*. at p. 5, ¶ 14 (citing Doc. 66-1 at 153-154); *id*. at p. 32, ¶ 10. (DHS disputes these
facts, Doc. 80 at ¶ 10, but they are supported by the evidence cited by Saxton, Doc. 66-1 at 59-60
(83:14-15; 86:23-87:12), 153-156.) For instance, on October 22, Smith assigned Saxton and
another reservist to work in "one of the worst crime areas" in Charleston, some five miles from
the other team members. Doc. 66-1 at 154; Doc. 74 at p. 32, ¶ 10. (DHS disputes that the area
was dangerous, Doc. 80 at ¶ 10, but this fact is supported by the evidence cited by Saxton, Doc.
66-1 at 154.) Saxton told Smith that she felt threatened at the site, citing an encounter with a
disaster survivor who acted aggressively. Doc. 74 at p. 5, ¶ 14. In response, Smith at first told

4

Saxton to call the local police for help, but later instructed her to return to her hotel when the police could not provide her an escort. *Ibid*.

The following morning, October 23, Smith assigned Saxton to a different worksite with another partner. *Id*. at p. 5, ¶ 15. After the pair notified Smith about a negative encounter with a disaster survivor, they started driving away from the area. *Id*. at p. 32, ¶ 10; Doc. 66-1 at 154. At about 1:00 p.m., Smith phoned Saxton and instructed the pair to return to the site. Doc. 66-1 at 154. (DHS denies that Smith issued that order, Doc. 80 at ¶ 10, but this fact is supported by the evidence cited by Saxton, Doc. 66-1 at 60 (86:23-87:12), 154.) At 8:05 p.m., Saxton emailed Smith to let him know that she and her partner were still waiting for a police escort at the site. Doc. 74-3 at 8. Only then did Smith send an email instructing her to "[c]ome on back to the hotel if you don't feel safe." *Ibid*.

At some point prior to October 23, Saxton asked to be "demobilized" on November 15 to accommodate a court date for a state court civil matter. Doc. 74 at p. 6, ¶ 17 (citing Doc. 66-1 at 176). By email, she indicated that she could be re-deployed "on December 1, 2015 if needed." Doc. 66-1 at 176.

On October 24, Saxton lodged an administrative complaint against Smith with FEMA's Office of Equal Rights ("OER"). Doc. 74 at p. 6, ¶ 18; Doc. 66-1 at 199-203. A day later, Saxton contacted McKinnon, her task force leader, to report that Smith was giving her unwanted attention. Doc. 74 at p. 7, ¶ 20. McKinnon responded by transferring Saxton to a different crew led by John Conti, and Saxton sent McKinnon a note expressing thanks. *Id*. at pp. 7-8, ¶¶ 20-21.

On October 28, McKinnon advised crew leaders of the 26 reservists who would demobilize the following week. *Id*. at p. 8, ¶ 22 (citing Doc. 74-2 at 53-54). Among them was Saxton, who was listed along with eight members of her then-present crew (Conti's) but only

four members of her former crew (Smith's).  Doc. 74-2 at 54.  Saxton demobilized from South

Carolina on November 5.  Doc. 74 at p. 8, ¶ 23.  FEMA did not remobilize Saxton until February

2016, when she was briefly deployed to Arkansas.  *Id*. at p. 34, ¶ 17; Doc. 66-1 at 139.

####    B.      Louisiana Deployment

On March 19, 2016, FEMA deployed Saxton to Baton Rouge, Louisiana.  Doc. 74 at

p. 35, ¶ 18; Doc. 66-1 at 139.  She flew into New Orleans, rented a car, and drove to the Baton

Rouge JFO.  Doc. 74 at p. 35, ¶ 18.  On March 30, Saxton was sent to Minden, Louisiana, where

she remained deployed until May 10.  *Ibid*.; Doc. 66-1 at 139.  During her deployment, John

Rovello was her crew leader and Shelia Kosier, a white woman, was her deputy task force

leader.  Doc. 74 at p. 35, ¶ 18; *id*. at p. 8, ¶ 24.

FEMA's dress code states: "Personal appearance and hygiene play an important role in

projecting a professional image in the office, in the community and to the customers we serve."

*Id*. at p. 9, ¶ 25 (quoting Doc. 66-1 at 231).  In keeping with this directive, the dress code deems

"clothing that reveals too much cleavage, back, chest, or stomach" to be "unacceptable."  *Ibid*.

(quoting Doc. 66-1 at 232).  In the final five days of Saxton's deployment, Kosier began taking

issue with her attire.  *Id*. at p. 35, ¶ 19; Doc. 75 at 17.  On one occasion at the hotel swimming

pool, while Saxton was off duty, Kosier remarked in front of a group of women that she was

"[b]ougie, uppity … suggesting that … [she] was too dressed up[.]"  Doc. 66-1 at 77 (154:7-9);

Doc. 74 at p. 35, ¶ 19.  During another incident by the pool, Kosier called Saxton "half naked" in

front of her coworkers.  Doc. 66-1 at 77 (154:16-19), 279; Doc. 74 at p. 35, ¶ 19.  (DHS denies

that Kosier made those comments, Doc. 80 at ¶ 19, but those facts are supported by the evidence

cited by Saxton, Doc. 66-1 at 77 (154:3-19), 96-97 (233:23-234:10).)

On May 5, Kosier saw Saxton wearing attire that she believed was "not suitable to wear

in the field" and asked Rovello to counsel her.  Doc. 74 at p. 9, ¶ 27 (quoting Doc. 66-1 at 242);

*see also id*. at p. 35, ¶ 20 (noting that Kosier took issue with Saxton's wearing of "scooped tanks") (quoting Doc. 74-4 at 6). Rovello spoke with Kosier that day. *Id*. at p. 9, ¶ 27 (citing Doc. 66-1 at 244). After Kosier asked Rovello for his "write up" of the discussion, Rovello noted that Saxton told him that she had never been issued a FEMA shirt, but that she "does have the proper credentials, that is also correctly worn while on duty." *Id*. at pp. 35-36, ¶ 21 (quoting Doc. 74-4 at 8). Reservists are not required to wear FEMA shirts. *Id*. at p. 36, ¶ 23.

Kosier drove to Saxton's worksite the following day to bring her a FEMA shirt. *Id*. at p. 10, ¶ 28. Upon approaching her, Kosier reached into Saxton's blouse and "slapped" her breasts, *id*. at p. 36, ¶ 23; Doc. 66-1 at 81 (170:16-172:1), stating, "This is an issue," Doc. 74 at p. 36, ¶ 23 (quoting Doc. 66-1 at 97 (235:18-236:1)). Saxton never saw Kozier criticize the attire of male or white female employees or touch their chests. *Id*. at p. 35, ¶ 20.

That afternoon, Saxton wrote an email to Kosier thanking her for bringing a FEMA shirt and for purchasing it with her own funds. *Id*. at p. 10, ¶ 29. Later that evening, however, Saxton emailed Mary Dawson, Branch Director for the Louisiana deployment, to complain about her encounter with Kosier. *Id*. at p. 10, ¶ 30. Saxton stated that Kosier had "expressed that [Saxton's] cleavage was an issue by tapping the top of [her] breast on each side," which was "unsettling." *Ibid*. (quoting Doc. 66-1 at 258-259). Saxton also was upset that Kosier had given her a shirt that was a large rather than a medium. *Id*. at p. 11, ¶ 31.

Dawson responded immediately, and Dawson, Saxton, and Rovello had a conference call on May 7. *Id*. at p. 11, ¶ 32. Dawson arranged for alternative dispute resolution sessions for Dawson, Kosier, Rovello, and Saxton, among others, to take place on May 10. *Id*. at p. 11, ¶ 33. After deciding to lodge a second administrative complaint with OER, Saxton told Dawson that she wished to cancel the dispute resolution sessions. *Id*. at p. 11, ¶ 34; *id*. at p. 36, ¶ 24. Dawson

responded that she understood and that "the process you choose is entirely your decision to make." *Id*. at p. 11, ¶ 35 (quoting Doc. 66-1 at 274).

Saxton thereafter lodged her second OER complaint, this one alleging Kosier subjected her to discrimination based on race and sex as well as to retaliation. *Id*. at p. 12, ¶ 36 (citing Doc. 66-1 at 277-279). An Equal Employment Opportunity investigator interviewed Kosier. *Id*. at pp. 12-13, ¶ 40. During the interview, Kosier admitted: "Yes, I did touch her, but it was a touch of demarcation. I was trying to encourage her to wear shirts that were more appropriate. It was a quick little touch. It was the wrong thing to do. I was trying to get my message across about what was appropriate working in the field." *Ibid*. (quoting Doc. 66-1 at 248).

## C.    Texas Deployment

On May 10, 2016, the final day of her Louisiana deployment, Saxon received a last-minute assignment to deploy to Austin, Texas. *Id*. at p. 37, ¶ 27 (citing Doc. 74-2 at p. 5, ¶¶ 37-39). Since it was late in the day, Saxton could not find a hotel in Baton Rouge for the night, and someone at the Baton Rouge JFO told her that she would not be able to get to Austin by nightfall. *Id*. at pp. 37-38, ¶¶ 27-28; Doc. 74-2 at p. 5, ¶¶ 40-41. Because she had been trained not to drive at night, Saxton decided to drive to Houston, spend the night there, and continue on to Austin the next day. Doc. 74 at p. 38, ¶¶ 28-29. Saxton was not required to report to the Austin JFO at any particular time, and, in the past, she did not need to get permission to stop at a hotel between deployments. *Id*. at p. 38, ¶ 29. According to Dawson, though, Saxton ignored her instructions to ask Tony Nguyen, the Texas DSA Branch Director, or Nina Coleman, the Texas DSA Reports Manager, for permission to overnight in Houston. *Id*. at p. 14, ¶¶ 44-45. Saxton denies that Dawson gave her those instructions, and disputes that she had to obtain permission for the overnight. *Ibid*.

8

On the morning of May 12, Dawson emailed Saxton, "I didn't see you when you left the JFO [in Baton Rouge], what was the decision on your travel to Texas?" *Id*. at p. 38, ¶ 30 (quoting Doc. 66-1 at 289). Copying Nguyen, Saxton replied that she had spoken to Dawson three times before she left, adding, "I can only pray that I am not entering a hostile work environment tomorrow due to me filing the [OER] complaint in Louisiana." *Id*. at p. 38, ¶ 30 (quoting Doc. 74-2 at 64). An hour later, Nguyen emailed Dorothy Hamory, the Texas DSA Deputy Branch Director, to recommend that Saxton be removed from deployment, adding, "[w]e don't need this type of behavior[] here." *Id*. at p. 39, ¶ 32 (quoting Doc. 66-1 at 287). Nguyen instructed Hamory to ask Kathy Davis (one of FEMA's Human Resources officers) and Joanne Hagglund (FEMA's Chief of Staff) for their input and to take appropriate action. Doc. 66-1 at 287. The next day, Dawson forwarded Saxton's email to OER officer Patricia Glenn, adding: "FYSA [for your situational awareness]—I am anticipating a problem." Doc. 74 at p. 38, ¶ 31 (quoting Doc. 74-2 at 64).

On May 13, shortly after arriving in Austin, Saxton was pulled out of a training to meet with Hagglund, Davis, and Hamory, who counseled her for her supposedly unauthorized stopover in Houston. *Id*. at p. 39, ¶ 33; *id*. at p. 14, ¶ 46. According to Saxton, Nguyen "was screaming at her over a speaker phone" during the meeting. *Id*. at p. 39, ¶ 33. (DHS disputes this fact, Doc. 80 at ¶ 33, but it is supported by the evidence cited by Saxton, Doc. 74-2 at p. 6, ¶ 50.) Disturbed by the situation, Saxton began asking for the names of the others at the meeting. Doc. 74 at p. 39, ¶ 34. The tenor of the meeting immediately shifted, with the others assuring Saxton that they were simply concerned about her safety. *Ibid*. After the meeting, Hamory emailed Nguyen with the group's decision to retain Saxton on the deployment, stating:

"It was quite plain that [Saxton] was tired and very emotional and made some poor choices …
[but] none of us thought there was a basis for sending her home."  Doc. 66-1 at 286.

Saxton was troubled by the treatment she received at the May 13 meeting, which she
believed was retaliation for her OER complaints.  Doc. 74 at p. 39, ¶ 35.  Given her concern,
Saxton contacted OER to see if any documents related to the meeting were placed in her
personnel file and, if so, to request that they be removed.  *Id*. at pp. 39-40, ¶ 36.  OER contacted
Nguyen, who indicated that no such documents were in her file.  *Id*. at p. 40, ¶ 37.  Even though
Nguyen never personally interacted with Saxton, he told OER that "his experience with [Saxton]
in the past had been such that he felt … action [should have been] taken against her[.]"  Doc. 74-
4 at 22; Doc. 74 at p. 40, ¶ 37.  (Saxton asserts that she contacted OER to lodge a formal
complaint against Nguyen and the others about the May 13 meeting.  Doc. 74 at p. 39, ¶ 36.
DHS, however, is correct that Saxton's assertion is unsupported by the evidence she cites.
Doc. 80 at ¶ 36.)

On June 2, Saxton successfully completed her Austin deployment and was deployed to
Houston.  Doc. 74 at p. 15, ¶ 47; *id*. at p. 40, ¶ 38; Doc. 66-1 at 139.  In late June, Saxton asked
to be demobilized from Houston in order to obtain emergency dental care.  Doc. 74 at p. 16,
¶ 49; *id*. at p. 40, ¶ 39.  Deputy Branch Director Ben Barron granted her request, directing her to
demobilize through the Austin JFO on June 29 or 30 and to travel "home" to Illinois the
following day.  *Id*. at p. 16, ¶ 50 (quoting Doc. 66-1 at 302).  Saxton agreed to do so.  *Id*. at p. 16,
¶ 51.  However, because Saxton had obtained her rental car in Louisiana, she decided to return
the car in Louisiana, rather than in Texas, to avoid paying a surcharge that she believed FEMA
would not cover.  *Id*. at p. 41, ¶ 40.  Accordingly, on June 29, Saxton booked a July 1 flight from
New Orleans to Illinois, and she drove to New Orleans the following day.  *Id*. at pp. 16-17,

¶¶ 52-53.  Upon her arrival, Saxton began experiencing severe menstrual issues that required her to postpone her return to Illinois.  *Id*. at p. 41, ¶ 41.  She stayed in a hotel paid for by a friend until July 4, changing her flight twice to extend her stay.  *Id*. at p. 17, ¶ 54.

DHS takes the position that Saxton failed to follow two FEMA policies when she demobilized from Texas.  *Id*. at p. 19, ¶ 60.  The first requires a reservist to obtain advance permission to travel home from an alternate location instead of from the location of the deployment.  *Id*. at p. 20, ¶ 61 (citing Doc. 66-1 at 335) ("An Approving Official may authorize a traveler to stop at an alternate location before resuming travel and returning to his or her [official station] or [residence of record], … but the reimbursement will be limited to the cost of travel by a direct route or on an uninterrupted basis … and the trip must be approved before travel begins.").  The second policy requires a reservist to complete a "cost comparison" so that the agency can evaluate the expense of granting the request to travel home from an alternate location.  *Id*. at p. 22, ¶ 64 (citing Doc. 66-1 at 335) ("Travelers must complete a cost comparison with supporting documentation for travel to/from an alternate location.").  Saxton denies that she violated either policy.  *Id*. at pp. 19-25, ¶¶ 60-65, 67; *id*. at p. 41, ¶ 40.  She contends that both policies concern only reimbursement, *id*. at pp. 19-25, ¶¶ 60-65, 67, and that in any event it was unnecessary to request permission or to complete a cost comparison to travel home from Louisiana because she was initially deployed there, *ibid*.; *id*. at p. 42, ¶¶ 44-45.

### D.    Travel Voucher

After returning to Illinois, Saxton on July 12 created and signed a travel voucher for her Texas deployment expenses.  *Id*. at p. 41, ¶ 42.  The software program Saxton used to create the voucher automatically populates certain fields based on the dates a reservist travels to and from her duty station.  *Ibid*.  Before submitting her voucher, Saxton confirmed that all expenses for which she sought reimbursement were true, accurate, and appropriate for payment.  *Id*. at p. 26,

¶ 70; *id*. at p. 24, ¶ 66 (citing Doc. 66-1 at 361) ("A traveler is not entitled to per diem if he or she is not on official travel."). Although FEMA policy provides that "[t]ravelers who knowingly submit false or fraudulent claims are subject to disciplinary action," *id*. at p. 24, ¶ 66 (citing Doc. 66-1 at 419), Saxton asserts that, in practice, "errors on" or "disagreements" about vouchers do not lead to an employee's termination, *id*. at pp. 42-43, ¶ 46 ("If FEMA believes there is an overpayment, they simply request that the employee reimburse the funds.").

The next morning, Esther Herrera, a FEMA specialist tasked with reviewing vouchers, emailed Jill Carey, the Travel Manager, to note "quite a few errors" in Saxton's voucher, such as expenses claimed for days of per diem with no hotel stay. Doc. 66-1 at 494. One of Herrera's colleagues, Portia Harris, corresponded with Saxton about removing the per diems claimed for July 2 and 3, 2016—the days that she could not travel home to Illinois due to her menstrual problems. Doc. 74 at p. 41, ¶ 42.

The parties dispute which particular expenses Saxton claimed on her final voucher. According to Saxton, the final voucher reviewed and accepted by FEMA did not include per diem entries for July 2 and 3. *Id*. at pp. 41-42, ¶ 43 (citing Doc. 74-3 at 2-4). In support, Saxton cites a version of the voucher labeled VCH187539. *Ibid*. DHS counters that the document cited by Saxton was an "in-progress" version of the voucher, Doc. 80 at ¶ 47, and asserts that the true, final voucher was another document (bearing the same label) claiming $118 in per diem for July 2 and 3 ($59 for each day), Doc. 74 at p. 26, ¶ 69 (citing Doc. 66-1 at 478-480). DHS adds that FEMA paid Saxton that $118. *Id*. at p. 27, ¶ 72 (citing Doc. 66-1 at 503). (Saxton disputes DHS's assertion that she was paid per diem reimbursements for those two days. *Id*. at pp. 27-28, ¶ 72. Because the evidence cited by Saxton, Doc. 74-3 at 2-4; Doc. 66-1 at 335; Doc. 74-2 at p. 8, ¶ 70, does not controvert DHS's assertion, it is admitted.)

12

As Saxton tells it, the document that DHS holds out as the final voucher was "falsified," Doc. 74 at p. 27, ¶ 71, having been created when "someone [at FEMA] opened a new voucher on July 25, 2016 with a new voucher number (VCH187539-1) and added per-diem for July 2, 2016 and July 3, 2016," *id*. at p. 43, ¶ 47 (citing Doc. 74-3 at 6). Saxton further asserts that Nguyen participated in that exercise as retaliation for her OER complaints. *Id*. at p. 43, ¶¶ 48-49. In support, Saxton notes that Nguyen: (1) asked Jill Carey, the Travel Manager, to review the voucher, *id*. at p. 43, ¶ 48; (2) pushed for FEMA to "review[] and monitor[]" Saxton's behavior on the justification that her failure to obtain approval for her travel was becoming a "pattern," Doc. 66-1 at 509; Doc. 74 at p. 43, ¶ 48; and (3) falsely claimed when he was contacted by OER that he was unaware of Saxton's OER complaints, Doc. 74 at p. 40, ¶ 37 (citing Doc. 66-1 at 299). (DHS contends that Nguyen did not lie to OER about this, Doc. 80 at ¶ 37, but the fact is supported by the evidence Saxton cites—namely, the May 12, 2016 email that she sent to Dawson and Nguyen referencing the OER complaint she lodged in Louisiana, Doc. 74-2 at 64).

### E.    Saxton's Termination

FEMA fired Saxton on August 29, 2016. Doc. 74 at p. 29, ¶ 76. A labor relations specialist prepared the termination letter, which was reviewed by a reservist program manager and signed by Saxton's cadre coordinator. *Id*. at p. 28, ¶ 75. FEMA stated in the letter that Saxton's release was due to her failure to follow written agency policy by: (1) traveling to New Orleans instead of directly from Austin to Illinois without prior approval and without submitting a travel cost comparison; and (2) collecting $118 in per diem funds for July 2-3 when she was not on official travel. *Id*. at p. 29, ¶ 76 (citing Doc. 66-1 at 514-516). Saxton appealed her termination, which FEMA upheld. *Id*. at p. 29, ¶ 77. Saxton thereafter amended her second OER complaint to add her termination as another way in which FEMA retaliated against her. *Ibid*.

13

## Discussion

As noted, the complaint alleges that DHS subjected Saxton to a hostile work environment, discriminated against her due to her sex and race, and retaliated against her for lodging two OER complaints. Doc. 1 at ¶¶ 21-38. Saxton's summary judgment opposition brief defends only her claims that Smith and Kosier subjected her to a sex-based hostile work environment, Doc. 75 at 9-18; that Kosier's harassment subjected her to race discrimination, *id*. at 18-19; and that DHS terminated her in retaliation for her OER complaints, *id*. at 19-23. Saxton has abandoned any claims set forth in her complaint that her opposition brief does not defend. *See Gates*, 916 F.3d at 641 ("The district court was not required to address a claim or theory that plaintiff did not assert [in opposition to summary judgment]."); *Keck Garrett & Assocs. v. Nextel Commc'ns, Inc.*, 517 F.3d 476, 487 (7th Cir. 2008) (same).

## I.     Sex-Based Hostile Work Environment Claim

Title VII's antidiscrimination provision makes it "unlawful … for an employer … to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The provision protects against "the creation of a hostile work environment that is severe or pervasive enough to affect the terms and conditions of employment." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 561 (7th Cir. 2016) (internal quotation marks omitted). To survive summary judgment on a sex-based hostile work environment claim, a plaintiff must adduce evidence sufficient for a reasonable jury to find "that she was: (1) subjected to unwelcome sexual conduct, advances, or requests; (2) because of her sex; (3) that were severe or pervasive enough to create a hostile work environment; and (4) that there is a basis for employer liability." *Lapka v. Chertoff*, 517 F.3d 974, 982 (7th Cir. 2008) (internal quotation marks omitted). Focusing on the third and fourth elements, DHS contends

that the harassment Saxton suffered does not qualify as "severe or pervasive" and that there is no basis for employer liability.  Doc. 65-1 at 25-29; Doc. 79 at 6-10.

### A.        Severe or Pervasive Harassment

The "severe or pervasive" element of a hostile work environment claim is phrased "in the disjunctive—the conduct must be *either* severe *or* pervasive."  *Vance v. Ball State Univ.*, 646 F.3d 461, 469 (7th Cir. 2011), *aff'd*, 570 U.S. 421 (2013).  This means that "one extremely serious act of harassment could rise to an actionable level[,] as could a series of less severe acts." *Hall v. City of Chicago*, 713 F.3d 325, 330 (7th Cir. 2013) (internal quotation marks omitted).  A court addressing whether harassment is "severe or pervasive" must consider "factors like the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance."  *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016); *see also Johnson*, 892 F.3d at 900 (similar).  In so doing, the court must bear in mind that Title VII does not impose a "general civility code" and that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation and internal quotation marks omitted).  That said, "the [work] environment need not reach the point of 'hellishness'" to be actionable.  *Johnson*, 892 F.3d at 901; *accord Gates*, 916 F.3d at 637 ("While a 'hellish' workplace is surely actionable, plaintiffs' evidence need not show a descent into the Inferno.").  "Whether harassment was so severe or pervasive as to constitute a hostile work environment is generally a question of fact for the jury."  *Johnson*, 892 F.3d at 901.

Drawing all reasonable inferences in Saxton's favor, the summary judgment record shows that Smith subjected Saxton to a fusillade of harassment while serving as her crew leader

in South Carolina. Among other things, Smith insinuated while squeezing Saxton's shoulder that she needed to have sex to alleviate tension; suggested it was in her best interest to come to his hotel room; repeatedly asked her to move to his hotel; and threatened to send her home if she did not have sex with him. *See Orton-Bell v. Indiana*, 759 F.3d 768, 774-75 (7th Cir. 2014) (holding that a "constant barrage of sexually charged comments" was sufficiently severe or pervasive); *Jackson v. Cnty. of Racine*, 474 F.3d 493, 500 (7th Cir. 2007) (holding that a combination of unwanted touching, offensive sex-based remarks, and the harasser's "clumsy effort to induce [the plaintiff] to succumb to sexual relations in exchange for a promotion" could support a finding that the harasser's conduct "alter[ed] the terms and conditions of [the plaintiff's employment]"). Exacerbating matters, when Saxton rejected Smith's advances, he changed her field partners, denied her time off, and sent her to unsafe work sites far from other team members. *See EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 626 (7th Cir. 2018) (recognizing that an employer can create a hostile work environment by "demeaning, ostracizing, or even terrorizing the victim because of her sex"); *Hall*, 713 F.3d at 331 (holding the "severe or pervasive" element satisfied where a supervisor isolated the plaintiff from her coworkers and suppressed her efforts to take on more work). Given all this, a reasonable jury could find that Smith's conduct was severe or pervasive.

The same holds for Kosier's conduct. Drawing all reasonable inferences in Saxton's favor, the summary judgment record shows that Kosier slapped Saxton's breasts and made negative comments about her attire, including remarking that she was "half naked." That conduct, while not as pervasive as Smith's, could qualify in a reasonable jury's eyes as severe or pervasive. *See EEOC v. Mgmt. Hosp. of Racine, Inc.*, 666 F.3d 422, 433 (7th Cir. 2012) (holding that three instances of harassing conduct, including "'slap groping' [the plaintiff's] buttocks,"

qualified as severe or pervasive); *Patton v. Keystone RV Co.*, 455 F.3d 812, 817 (7th Cir. 2006) (holding that a co-worker's "groping [the plaintiff] under her shorts" "until he touched her underwear" "might be sufficient alone to create an abuse working environment").

### B. Employer Liability

To determine whether there is a basis for employer liability, the court "must first decide whether the alleged harassment was perpetrated by supervisors or coworkers." *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 930 (7th Cir. 2017) (internal quotation marks omitted). If the harasser was the plaintiff's supervisor—that is, if the harasser had "the power to directly affect the terms and conditions of the plaintiff's employment," including "the authority to hire, fire, promote, demote, discipline or transfer [the] plaintiff"—then the employer "is strictly liable" for the harassment. *Ibid.* (internal quotation marks omitted). If the harasser "was merely a coworker," by contrast, then the employer "is liable only if it was negligent either in discovering or remedying the harassment." *Ibid.* (internal quotation marks omitted). An employer is negligent in remedying harassment if "it failed to take prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 898 (7th Cir. 2016) (internal quotation marks omitted).

A reasonable jury could find that employer liability exists because both Smith and Kosier—as Saxton's crew leader in South Carolina and deputy task force leader in Louisiana, respectively—were her supervisors. True enough, Smith's and Kosier's ability to direct Saxton's day-to-day activities is not enough, standing alone, to make them her supervisors under Title VII. *See Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 390 (7th Cir. 2010). But Smith's authority to send Saxton home early from deployment—evidenced by her averment that he threatened to "send [her] home if [she] did not sleep with him," as well as her averment that crew leaders "can

kick you off the deployment," which "effectively end[s] your employment because you have no idea when the next deployment will be," Doc. 74-2 at p. 2, ¶¶ 10-12—raises a genuine issue as to whether he had the authority to "discipline" or "transfer" her. *Nischan*, 865 F.3d at 930; *cf. Gawley v. Ind. Univ.*, 276 F.3d 301, 305, 310-11 (7th Cir. 2001) (expressing the court's "reluctan[ce] … to find" that a lieutenant police officer who "did not have final authority to hire or fire [the plaintiff]," but who "had some disciplinary authority over" her, was not her supervisor for Title VII purposes). Likewise, the record would allow a reasonable jury to conclude that Kosier—who outranked Smith in the chain of command—had the authority to discipline given that Kosier directed Rovello to counsel Saxton on her clothing and later asked him for his "write up" of Saxton. Doc. 74 at p. 35, ¶¶ 20-21.

Accordingly, Saxton's claim that DHS, through Smith's and Kosier's conduct, subjected her to a hostile work environment survives summary judgment.

## II.     Race Discrimination Claim

The only race discrimination claim that Saxton defends on summary judgment concerns the harassment that she suffered at Kosier's hands. Doc. 75 at 6-7, 18-19. DHS argues that Saxton failed to exhaust that claim because her second OER complaint did not allege that Kosier called Saxton "uppity." However, "[b]ecause most [administrative] charges are completed by laypersons rather than by lawyers, a Title VII plaintiff need not allege in an [administrative] charge each and every fact that combines to form the basis of each claim in her complaint." *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994). As the Seventh Circuit has held, a plaintiff may bring in court any claim that is "like or reasonably related to the allegations in h[er] [administrative] charge," *Moore v. Vital Prods., Inc.*, 641 F.3d 253, 257 (7th Cir. 2011), which means that the claim and charge "must, at minimum, describe the same conduct and implicate the same individuals," *ibid.* (quoting *Cheek*, 31 F.3d at 501). Saxton has satisfied that

test, as her race discrimination claim involving Kosier grows out of the same course of race-based harassment that Saxton alleged in her second OER charge. Doc. 66-1 at 279 ("Once Shelia Kosier discovered my ethnicity her attitude towards me change[d]. Kosier constantly commented on my attire after work at my hotel residence, implying that I was dressing too fancy[,] … shouted in front of fellow coworkers, 'your half naked'[,] [sic] … [and] told my crew leader to write me up for inappropriate attire.").

True enough, Kosier's harassment of Saxton was more explicitly sex-based than race-based. However, a reasonable jury could find that the harassment was due to Saxton's race given evidence that Kosier called Saxton "uppity" in front of a group of women and did not criticize white employees' attire or slap their breasts. *See Cole*, 838 F.3d at 896 ("[F]orms of harassment that might seem neutral in terms of race … can contribute to a hostile work environment claim if other evidence supports a reasonable inference tying the harassment to the plaintiff's protected status."); *Vance*, 646 F.3d at 470 (holding that a plaintiff need not "identify an explicitly racial dimension of the challenged conduct to sustain a Title VII [race harassment] claim," but rather need only "attribute a racial character or purpose to it") (internal quotation marks omitted); *Vovillia v. Ill. Dep't of Human Servs.*, 2019 WL 2994533, at *7 (N.D. Ill. July 9, 2019) (holding that although "[s]ome aspects of the alleged harassment were not inherently racial," comments with a "racial character" directed towards the plaintiff could lead "a reasonable jury … [to] find that the overall pattern of harassment was racially motivated"). For this reason and those set forth in holding that her sex harassment claim survives summary judgment, Saxton may proceed to trial on the hostile work environment component of her race discrimination claim.

## III. Retaliation Claim

Title VII's antiretaliation provision "prohibits retaliation against employees who engage in statutorily protected activity by opposing an unlawful employment practice or participating in

the investigation of one." *Lord*, 839 F.3d at 563 (citing 42 U.S.C. § 2000e-3(a)). "To establish a … retaliation [claim] under Title VII, [Saxton] must show: (1) [s]he engaged in a statutorily protected activity, (2) [her] employer took a materially adverse action against [her], and (3) there is a causal link between the protected activity and the adverse action." *Mollet v. City of Greenfield*, 926 F.3d 894, 896 (7th Cir. 2019). Although the complaint alleges several acts of retaliation, Doc. 1 at ¶¶ 22-24, Saxton's opposition brief predicates her claim exclusively on her termination, Doc. 75 at 19-23. DHS does not dispute that Saxton's OER complaints are protected activity or that her termination is a materially adverse action, focusing exclusively on the causation element of her claim. Doc. 79 at 4-6.

Under the framework set forth in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), a Title VII retaliation claim survives summary judgment if the plaintiff presents evidence that, "considered as a whole," would allow a reasonable jury to find that her protected activity caused an adverse employment action. *Id*. at 765. Although a plaintiff may satisfy her burden using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), *see Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 628-29 (7th Cir. 2018) ("In *Ortiz*, … we left *McDonnell Douglas* burden-shifting as a viable option for pursing employment discrimination claims."), Saxton does not press that framework in her brief, thereby forfeiting any reliance thereon. *See Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment."). Accordingly, the court will conduct the analysis directed by *Ortiz* and "assess cumulatively all the evidence" on which Saxton relies "to determine whether it permits a reasonable factfinder to determine" that her OER complaints caused her termination. *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th

Cir. 2017); *see also Swyear v. Fare Foods Corp.*, 911 F.3d 874, 883 (7th Cir. 2018) ("The parties have not framed their arguments using the *McDonnell Douglas* burden shifting framework, but rather have simply disputed whether sufficient evidence has been produced to support a jury verdict.").

"To prove causation, [Saxton] must show that the desire to retaliate was the but-for cause of" her termination, meaning that it "would not have occurred in the absence of" her protected activity. *Robinson v. Perales*, 894 F.3d 818, 830 (7th Cir. 2018) (internal quotation marks omitted); *see also Mollet*, 926 F.3d at 897 (holding that the plaintiff must show that "the protected activity was *the* but-for cause of the adverse action," not merely "*a* but-for cause"). "In the Title VII retaliation context, causation can be established by," among other things, "a pretextual explanation for the [adverse action]." *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018). "[P]retext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Burton v. Bd. of Regents of the Univ. of Wis. Sys.*, 850 F.3d 690, 698 (7th Cir. 2017) (alteration and internal quotation marks omitted); *see also Castro v. Devry Univ., Inc.*, 786 F.3d 559, 565 (7th Cir. 2015) ("The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the [adverse action].") (internal quotation marks omitted).

Saxton has adduced sufficient evidence of pretext to save her retaliation claim from summary judgment. Saxton contends that the "true" reason that DHS fired her was retaliation for her two OER complaints, rather than her alleged failure to follow agency policy concerning official travel and per diem reimbursement. Doc. 75 at 19-23. In support, Saxton submits that DHS fabricated her travel voucher to seek per diem reimbursement for two improper days,

plainly the most serious breach of policy set forth in her termination letter.  Doc. 74-2 at p. 9,

¶¶ 76-80.  As Saxton tells it, after submitting her voucher on July 12, she worked with FEMA's

voucher specialists to remove the per diem entries for July 2 and 3, which had been

automatically populated by the voucher software.  *Id*. at p. 8, ¶¶ 69-70.  Because she did not

access the voucher again, Saxton continues, the only possible explanation for her final voucher

including the two improper per diem entries is that someone at FEMA opened a new voucher on

July 25 and added back those entries to get her fired as payback for her protected activity.  *Id*. at

p. 9, ¶¶ 76-80; Doc. 75 at 20.

If Saxton's evidence stopped there, her retaliation claim might not survive summary

judgment because it likely would not link her termination with her protected activity.  But

contrary to DHS's submission, Doc. 65-1 at 25, there *is* evidence that at least one official

involved in terminating Saxton—Nguyen, who directed FEMA's Travel Manager to review the

allegedly "altered" voucher—knew about her OER complaints.  Given that Nguyen was copied

on Saxton's May 12 email to Dawson, Doc. 74-2 at 64 ("I can only pray that I am not entering a

hostile work environment tomorrow due to me filing the [OER] complaint in Louisiana."), a

reasonable jury could find that Nguyen was being untruthful when he told OER that he had no

knowledge of Saxton's protected activity.  Taken together with evidence that Nguyen harbored

ill will toward Saxton—*e.g.*, he screamed at her when she was pulled out of a training in Austin,

tried to remove her from the Houston deployment, and urged FEMA to monitor her behavior—

and with evidence that Saxton submitted a compliant voucher, this raises a genuine issue of fact

as to whether Nguyen worked behind the scenes to orchestrate the falsification of the voucher in

order to get Saxton fired.

Accordingly, Saxton's retaliation claim survives summary judgment.

**Conclusion**

DHS's summary judgment motion is granted in part and denied in part. The motion is denied as to Saxton's retaliation claim and her race-based and sex-based hostile work environment claims, and otherwise is granted. The case will proceed to trial on the retaliation and hostile work environment claims.

December 22, 2020

_____

United States District Judge